UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| DICKIE BREWER O/B/O | ) | |
| KIMBERLY ARRIAGA (DECEASED), | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 5:18-cv-01549-HNJ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND DISMISSAL ORDER

Plaintiff Dickie Brewer seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding Claimant Kimberly Arriaga's claim for supplemental security income. The undersigned has carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00–114.02. *Id.* at § 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. § 416.920(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 416.920(a)(4)(v); *see also* 20 C.F.R. § 416.920(g). If the

claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 446.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Arriaga, age 44 at the time of the ALJ hearing, protectively filed an application for supplemental security income on July 17, 2013, alleging disability as of

March 10, 2009.[2]   (Tr. 387).   The Commissioner denied her claim, and Arriaga timely

filed a request for a hearing.   (Tr. 120–146; 226–230).   The Administrative Law Judge

("ALJ") held a hearing on February 20, 2015.   (Tr. 88–119).[3]   The ALJ issued an opinion

denying Arriaga's claim on August 17, 2015.   (Tr. 147–171).   Arriaga timely requested

review of the ALJ's decision.

On February 14, 2017, the Appeals Council vacated the ALJ's decision and

remanded the case for further consideration of evidence regarding Arriaga's seizure and

depressive disorders.   (Tr. 177–179).   On May 28, 2017, Arriaga perished due to

nonalcoholic steatohepatitis[4] caused by necrotizing fasciitis.[5]   (Tr. 1657).   On July 31,

2017, the ALJ held a remand hearing at which Brewer, Arriaga's spouse, appeared and

testified as the substitute party.   (Tr. 16–50; 367).   The ALJ issued a second opinion

denying Arriaga's claim on February 14, 2018.   (Tr. 181–205).

Applying the five-step sequential process, the ALJ found at step one that Arriaga

---

[2] Arriaga also applied for, and the Commissioner ultimately denied, disability insurance benefits.   (Tr. 1–3; 120–146; 380–386).   Plaintiff Brewer does not appeal the denial of Arriaga's application for disability insurance benefits.   Thus, the court will not address this application or the Commissioner's adjudication thereof.

[3] The ALJ concluded this hearing prematurely because Arriaga experienced a seizure during the proceedings.   The ALJ held a supplemental hearing on June 16, 2015.   (Tr. 60–87).

[4] Nonalcoholic steatohepatitis occurs when "fat builds up in [the] liver."   See https://www.niddk.nih.gov/health-information/liver-disease/nafld-nash (last visited January 31, 2020).

[5] Necrotizing fasciitis refers to a skin infection "that can lead to multiple organ failure and death." *See* https://rarediseases.info.nih.gov/diseases/6454/necrotizing-fasciitis (last visited January 31, 2020).

had not engaged in substantial gainful activity since her alleged onset date. (Tr. 187). At step two, the ALJ found Arriaga had the severe impairments of a seizure disorder versus pseudoseizures/somatoform disorder, degenerative disc disease of the cervical spine, obesity, hypertension, and depressive disorder. (Tr. 192). At step three, the ALJ found that Arriaga's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 196).

Next, the ALJ found that Arriaga exhibited the residual functional capacity ("RFC") to perform light work. She could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds. In addition, she could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. Relatedly, she could frequently balance and occasionally stoop, kneel, crouch, and crawl. She could also tolerate occasional exposure to extreme heat, extreme cold, and humidity. (Tr. 200).

However, she should not be required to work in areas of vibration. Similarly, she should avoid: working at unprotected heights; working in close proximity to moving or dangerous machinery; working near large open bodies of water, or near an open fire or flame; and operating motorized vehicles and equipment. She could perform simple, routine tasks requiring no more than short, simple instructions and simple, work-related decision-making with few workplace changes. She could maintain frequent interactions with co-workers and supervisors, and occasional interactions with the general public.

Finally, she could adapt and respond appropriately to routine changes in the workplace. (*Id.*)

At step four, the ALJ determined that Arriaga did not retain the ability to perform her past relevant work as a dispatcher and school bus driver. (Tr. 203). At step five, the ALJ determined that, considering Arriaga's age, education, work experience, and RFC, a significant number of other jobs exists in the national economy that she could perform. (Tr. 203–204). Accordingly, the ALJ determined that Arriaga has not suffered a disability, as defined by the Social Security Act, from July 17, 2013,[6] through the date of her death. (Tr. 204). Arriaga timely requested review of the ALJ's decision. (Tr. 372–373).

The Appeals Council granted review, and on July 31, 2018, it issued a partially favorable decision. (Tr. 9–13; 374–379). The Appeals Council determined that the record evidence did not support the existence of Arriaga's alleged symptoms prior to September 22, 2016. (Tr. 12). Accordingly, the Appeals Council adopted the ALJ's finding that Arriaga did not suffer a disability entitling her to social security income for the period July 17, 2013, to September 21, 2016. (Tr. 9–10). However, the Appeals Council determined the record evidence supported Arriaga's disabling impairments manifesting September 22, 2016, and thereafter. (Tr. 12). The Appeals Council thus found that Arriaga became disabled on September 22, 2016, and remained disabled until

---

[6] A claimant's eligibility for social security income commences when the claimant is both disabled and has a pending application. 20 C.F.R. § 416.202.

the date of her death on May 28, 2017. (*Id.*)

The Appeals Council based its decision upon medical records reflecting that Huntsville Hospital admitted Arriaga on September 22, 2016, and subsequently diagnosed her with necrotizing fasciitis, septic shock,[7] acute kidney injury,[8] hyponatremia,[9] and hypoxic respiratory failure.[10] (Tr. 10). Arriaga underwent skin grafting and a series of debridements to treat her necrotizing fasciitis. (Tr. 1628). The Appeals Council also observed that on May 17, 2017, Hospice of North Alabama admitted Arriaga and diagnosed her with nonalcoholic steatohepatitis with the following comorbidities: chronic kidney disease, anemia, thrombocytopenia,[11] hypertension, depression, respiratory failure, cirrhosis, and portal vein thrombosis.[12] (*Id.*) In addition, the Appeals Council assigned significant weight to the opinion of state agency consultant Dr. Akintilo, who opined that Arriaga became disabled on September

---

[7] Septic shock occurs "when a body-wide infection leads to critically low blood pressure." *See* https://medlineplus.gov/ency/article/000668.htm (last visited January 31, 2020).

[8] Acute kidney injury refers to "an abrupt (within hours) decrease in kidney function." *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5198510/ (last visited January 31 2020).

[9] Hyponatremia, known as "low blood sodium," occurs when "the amount of sodium in the blood is lower than normal." *See* https://medlineplus.gov/ency/article/000668.htm (last visited January 31, 2020).

[10] Hypoxic respiratory failure occurs refers to "low levels of oxygen in the blood." *See* https://www.nhlbi.nih.gov/health-topics/respiratory-failure (last visited January 31, 2020).

[11] Thrombocytopenia occurs when the "blood has a lower than normal number of . . . platelets." *See* https://www.nhlbi.nih.gov/health-topics/thrombocytopenia (last visited January 31, 2020).

[12] Portal vein thrombosis "refers to the complete or partial obstruction of blood flow in the portal vein." *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2806552/ (last visited January 31, 2020).

22, 2016, when she was diagnosed with necrotizing fasciitis.  (Tr. 10–11).

The Appeals Council's July 31, 2018, opinion constitutes the Commissioner's final decision.  (Tr. 9–13).  On September 21, 2018, Brewer filed a complaint with the court seeking review of the Appeals Council's decision.  (Doc. 1).

## ANALYSIS

In this appeal, Mr. Brewer contends substantial evidence does not support the Appeals Council's decision.  Specifically, he argues that substantial evidence does not support the Appeals Council's adoption of the ALJ's RFC calculation for the period July 17, 2013, to September 21, 2016.  Brewer asserts the Appeals Council erred in adopting the ALJ's RFC calculation because the ALJ failed to fully consider the practical limitations arising from Arriaga's seizure versus pseudoseizure/somatoform disorder.  In addition, Brewer contends the ALJ improperly considered Arriaga's noncompliance with seizure medications.  After consideration of the record and the ALJ's decision, the court finds substantial evidence supports the ALJ's determination and Appeals Council's adoption thereof.

### I.    The RFC Included the Limitations from Arriaga's Impairments

Residual functional capacity" represents "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p.  A "regular and continuing basis" corresponds to eight hours a day, for five days a week, or an equivalent work schedule.  *Id.*  The regulations define RFC as "the most [a claimant] can still do despite [the claimant's] limitations."  20 C.F.R.

§ 404.1545(a)(1). In formulating an RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The ALJ examines all relevant medical and other evidence, including "any statements about what [the claimant] can still do that have been provided by medical sources," as well as "descriptions and observations [provided by the claimant, family, neighbors, friends, or other persons] of [the claimant's] limitations . . ., including limitations that result from . . . symptoms such as pain." 20 C.F.R. § 404.1545(a)(3). The claimant bears the burden of providing evidence the Commissioner will use to establish an RFC. *See* 20 C.F.R. § 404.1512(c). The responsibility for determining a claimant's RFC resides with the Commissioner. 20 C.F.R. §§ 404.1527(e), 404.1546(c).

Brewer argues the ALJ failed to fully consider the limitations associated with Arriaga's seizures. (Doc. 11 at 20–21). Specifically, Brewer contends the ALJ's RFC assessment fails to account for the headaches, fatigue, incontinence, tongue biting, convulsions, falling, and "sheer number of treatment days" incident to Arriaga's seizures. (Doc. 11 at 21). The court disagrees.

The ALJ identified seizure disorder versus pseudoseizures/somatoform disorder, degenerative disc disease of the cervical spine, obesity, hypertension, and depressive disorder as "severe" impairments. (Tr. 192). She then considered the "entire record" and "all symptoms" in assessing Arriaga's RFC. (Tr. 200). Similarly, the ALJ stated "the [RFC] has been assessed based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's

medically determinable impairments." (*Id.*) These statements indicate the ALJ considered all of Arriaga's impairments and included all of her limitations in formulating her RFC. *See Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 n.3 (11th Cir. 2010).

A diagnosis alone does not indicate a disability or limitations on a claimant's ability to work. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of . . . impairments does not reveal the extent to which they limit [a claimant's] ability to work or undermine the ALJ's determination in that regard."); *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662–63 (11th Cir. 1987) (diagnosis does not equate to existence of impairment); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (while doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on Osborn's ability to work, a requisite to a finding of disability.").

Substantial evidence supports the ALJ's RFC formulation. At the outset, the court notes the ALJ's RFC section does not detail the medical evidence of Arriaga's seizure disorder. Rather, the ALJ discussed this evidence at the second step of the sequential evaluation process, and the ALJ incorporated by reference said discussion in her RFC formulation. Assessing her RFC, the ALJ noted Arriaga "alleged she could not work due to chronic, daily seizures, sometimes more than one a day, *as detailed herein.*" (Tr. 201) (emphasis added). The ALJ assessed treatment records from multiple hospitals and neurologists to determine the severity of Arriaga's seizure disorder at step

two of her analysis. (Tr. 193–196). The ALJ thus encompassed this evidence in the RFC formulation by referencing Arriaga's seizure disorder "as detailed [t]herein." (Tr. 201).

> Moreover, the ALJ summarized her RFC assessment as follows:
>
> In sum, the above residual functional capacity assessment is generally supported by objective and repeated diagnostic testing and laboratory findings, careful consideration of the combination mental and physical impairments, and the clinical findings of multiple physicians and health care providers. Her allegations to the contrary are not supported by the objective medical and laboratory findings or the clinic evidence of record when considered as a whole.

(Tr. 203); *see Leven v. Comm'r of Soc. Sec.*, 605 F. App'x 967, 968 (11ᵗʰ Cir. 2015) ("'[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision,' so long as the decision enables the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole.") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11ᵗʰ Cir. 2005)); *Ostborg v. Comm'r of Soc. Sec.*, 610 F. App'x 907, 916 (11ᵗʰ Cir. 2015) (The Court determined the ALJ "gave sufficient reasons" for an RFC assessment deeming claimant capable of light work because the ALJ described claimant's leg-length discrepancy at step two of the analysis, including treatment claimant had obtained; the ALJ found at step three that claimant "was able to function normally"; and substantial evidence in treatment notes supported the ALJ's conclusions.); *Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 891-92 (11ᵗʰ Cir. 2013) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. . . . There is no rigid

requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole.") (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Dyer*, 395 F.3d at 1211)); *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 808–09 (11th Cir. 2013) (In affirming the ALJ's assessment claimant exhibited the RFC to perform light work, "the ALJ stated that he considered the record in its entirety, and he was not required to discuss every piece of evidence in denying [claimant's] application for disability benefits.") (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

Pursuant to the foregoing precedent and authority, the ALJ considered the following evidence at step two of the analysis, and, by extension, in formulating Arriaga's RFC. First, the ALJ discussed Huntsville Hospital records from 2013 to 2015, 2013 Huntsville Cardiovascular Clinic records, Crestwood Medical Center records from 2013 to 2015, the Clinic for Neurology records from 2013 to 2014, and Neurology Consultants records from 2014 to 2015. (*Id.*) This evidence comprises the entire record of Arriaga's treatment for her seizure disorder. Significantly, the ALJ's chronicle of this evidence includes substantially all of the evidence Brewer highlights in support of his argument that the ALJ failed to fully consider the limitations of Arriaga's seizure disorder. *Compare* Tr. 193–196 *with* Doc. 11 at 7–19.

In addition, the ALJ discussed Arriaga's subjective complaints in light of her medical records. (Tr. 201). The ALJ found Arriaga's subjective complaints about the

intensity, severity, and limiting effects of her seizure-related symptoms not entirely consistent with the medical evidence. (*Id.*) Doctors performed multiple examinations of Arriaga's brain between 2013 and 2016 to evaluate her seizure disorder, the results of which were consistently unremarkable: an August 2013 CT scan revealed "[n]o acute abnormality"; the results of an October 2013 EEG were "essentially normal"; and in May 2015, a CT scan and MRIs portrayed no abnormalities. (Tr. 790; 773; 1577; 1509–10).

Similarly, according to August 2013 neurology records, Arriaga's "[t]ongue biting was moderate and incontinence was noted for bladder on occasion." (Tr. 754). Referencing symptoms of the postictal state,[13] the records observe that Arriaga "essentially returns to normal over a period of minutes" after a seizure and "simply feels 'bad'[,] and develop[s] nausea and vomiting for a brief interval occasionally." (*Id.*) In addition, the records identify "sleep deprivation, anger, anxiety, stressful circumstances and stress" as precipitants for Arriaga's seizures. (*Id.*) According to May 2014 hospital records, Arriaga reported that her seizures improved following treatment by a neurologist and compliance with medication. (Tr. 1045).

Furthermore, the ALJ discussed treatment records stating Arriaga "followed a pattern of asking for [opioid pain medication] . . . and then only AFTER receiving []this

---

[13] The postictal state refers to "an abnormal condition that lasts for a period that begins when a seizure subsides and ends when the patient returns to baseline," which can affect "speech, motor, and memory" processes. *See* https://www.ncbi.nlm.nih.gov/books/NBK526004/ (last visited January 31, 2020).

med, she began shaking and 'seizing' so she would then get [an] IV [for benzodiazepines]," and thus, "could stop 'seizing' in order to get IV meds." (Tr. 1501). In addition, urine drug screens portrayed the presence of non-prescribed benzodiazepines, (tr. 1506), and amphetamines. (Tr. 1569).

Finally, in her RFC analysis, the ALJ gave substantial consideration to state agency examiner Dr. Wellman's evaluation of Arriaga's RFC. (Tr. 201). Dr. Wellman concluded Arriaga could perform a limited range of light work, including Arriaga's past relevant work as a dispatcher. (Tr. 140–143). The ALJ, however, identified additional limitations in Arriaga's RFC. To account for the stressful circumstances and stress that precipitate her seizures, the ALJ limited Arriaga to simple, routine tasks requiring short, simple instructions, simple, work-related decisionmaking, and few workplace changes. (Tr. 200). Furthermore, the ALJ considered the risk of falling and convulsions associated with Arriaga's seizures in precluding: the use of ladders, ropes, or scaffolds; the operation of motorized vehicles and equipment; working near large, open bodies of water; working near open fire or flame; working at unprotected heights; working in close proximity to moving or dangerous machinery; and working in areas of vibration. (*Id.*) Finally, the ALJ's discussion of Arriaga's hospital records demonstrate that the ALJ considered the time Arriaga spent undergoing treatment for her seizure disorder.

In light of Arriaga's medical records, substantial evidence supports the ALJ's determination of her RFC. Although Brewer maintains that Arriaga's impairments imposed greater work-related limitations than those determined by the ALJ, the court

cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel*, 631

F.3d at 1178 (citations and internal quotation marks omitted).

## II. The ALJ's Consideration of Arriaga's Noncompliance with Prescribed Treatment Does Not Warrant Reversal

Brewer contends the ALJ improperly considered Arriaga's noncompliance with

prescribed seizure medication because Arriaga's financial constraints hindered her

ability to purchase the medication.[14]  However, Brewer discusses and cites the ALJ's

August 17, 2015, decision for his contention. (Doc. 11 at 23–24). Formulating Arriaga's

RFC in her 2015 decision, the ALJ determined that Arriaga's noncompliance with

treatment undermined her credibility as to the seizure-related symptoms she alleged.

(Tr. 155–169).  Relatedly, the ALJ found that the evidence belied Arriaga's

representations that she could not afford her prescribed medications. (Tr. 168–169).

When a claimant cannot afford medical treatment, an ALJ should not draw a

negative inference from the claimant's failure to seek additional treatment. *McCall v.*

*Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1998); *see also Dawkins v. Bowen*, 848 F.2d 1211,

1213 (11th Cir. 1988) ("[P]overty excuses [a claimant's] noncompliance" with medical

treatment.).  Thus, "[w]hen the ALJ 'primarily if not exclusively' relies on a claimant's

failure to seek treatment, but does not consider any good cause explanation for this

---

[14] Brewer's brief references Arriaga's "purported 'noncompliance.'" (Doc. 11 at 23). However, Brewer acknowledges Arriaga did not take her seizure medications at times, (*id.* at 23–24), and the medical evidence portrays that doctors assessed Arriaga with "medical noncompliance" on various occasions. (Tr. 737; 848).  Accordingly, the record indicates that Arriaga engaged in episodic noncompliance.

failure, [the court should] remand for further consideration." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1268 (11ᵗʰ Cir. 2015) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11ᵗʰ Cir. 2003) (per curiam); *Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11ᵗʰ Cir. 2012) (per curiam)). "However, if the ALJ's determination is also based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists." *Henry*, 802 F.3d at 1268 (citing *Ellison*, 355 F.3d at 1275).

A plaintiff may appeal to a district court only a final decision of the Commissioner. 42 U.S.C. § 405(g) ("Any individual, after any *final decision* of the Commissioner of Social Security . . . , may obtain review of such decision by a civil action . . . .") (emphasis added). An ALJ's decision does not qualify as final if the Appeals Council vacates such decision and remands the case to the ALJ. *See Atkins v. Comm'r, SSA*, 596 F. App'x 864, 868 (11ᵗʰ Cir. 2015) ("[T]he [first] ALJ's decision never became final because the Appeals Council vacated it . . . ."); *Gibbs v. Barnhart*, 130 F. App'x 426, 429–30 (11ᵗʰ Cir. 2005) (the first ALJ's findings did not bind the second ALJ on remand because the Appeals Council vacated the first ALJ's decision); *Wireman v. Comm'r of Soc. Sec.*, 60 F. App'x 570, 571 (6ᵗʰ Cir. 2003) ("The only final decision in this case is the [most recent] hearing decision which is now before this court. All other decisions relevant to [plaintiff's] disability insurance benefits never became final as they were vacated pursuant to remands for further proceedings."); *Robinson v. Berryhill*, No. 16-00494-N, 2017 U.S. Dist. LEXIS 117447, at *9 (S.D. Ala. July 27, 2017) ("Because

the Appeals Council vacated the ALJ's initial . . . decision, the Court reviews the ALJ's second . . . decision . . . as the Commissioner's final decision."); *Kearney v. Comm'r of Soc. Sec.*, 14 F. Supp. 3d 943, 949 (S.D. Ohio 2014) ("An ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates that decision and remands the matter for further proceedings.") (citing *Wireman*, 60 F. App'x at 570).

Rather, an ALJ's vacated, non-final decision loses all legal effect and constitutes non-binding authority. *See Zuniga v. Comm'r of Soc. Sec.*, 772 F. App'x 870, 871 (11th Cir. 2019) (per curiam) ("Because the Appeals Council vacated the ALJ's earlier opinion, that opinion was stripped of its binding effect."); *Clapper v. Comm'r of Soc. Sec.*, No. 4:17-cv-00401-JHE, 2018 U.S. Dist. LEXIS 162879, at *25 (N.D. Ala. Sept. 23, 2018) ("A vacated [ALJ] decision is void."); *Murray v. Comm'r of Soc. Sec.*, No. 8:14-cv-2262-Oc-PRL, 2015 U.S. Dist. LEXIS 188442, at *6 (M.D. Fla. Sept. 22, 2015) ("Because it was vacated, the ALJ's prior decision has no legal effect . . . Decisions that have been vacated . . . 'have no legal effect whatever. They are void.'") (quoting *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002)); *Cunningham v. Colvin*, 4:13-cv-00485-LSC, 2014 U.S. Dist. LEXIS 125734, at *8 (N.D. Ala. Sept. 9, 2014) ("[B]ecause the Appeals Council vacated the first ALJ's written decision, the specific findings contained in that first written decision were never conclusively established and were subject to modification.") (citing *Sigma Int'l, Inc.*, 300 F.3d at 1280). Accordingly, the finality requirement of § 405(g) precludes a plaintiff from challenging in district court

an ALJ's null, vacated decision. *See Clapper*, 2018 U.S. Dist. LEXIS 162879, at *25 (plaintiff improperly raised an error on appeal because he did not challenge the ALJ's operative decision, but rather "point[ed] to the ALJ's first decision for th[e] error, . . . [which] was vacated by the Appeals Council.").

In accordance with the foregoing authority, the court must reject Brewer's challenge to the ALJ's 2015 RFC formulation and consideration of Arriaga's medical noncompliance. The ALJ's 2015 decision retains no legal effect in the case at bar, as the Appeals Council vacated this decision in its 2017 remand order. (Tr. 177–179). Rather, the operative decisions constitute the ALJ's subsequent 2018 decision, and the Appeals Council's decision adopting the ALJ's 2018 findings as to Arriaga's impairments for the period prior to September 22, 2016. *See Wireman*, 60 F. App'x at 571; *Robinson*, 2017 U.S. Dist. LEXIS 117447, at *9. The procedural posture of this case thus renders Brewer's argument meritless.

Furthermore, even assuming Brewer challenged the ALJ's operative 2018 decision, there exists no evidence that Arriaga's medical noncompliance constituted the sole or primary basis for the ALJ's RFC formulation and ultimate finding she was not disabled. The ALJ noted Arriaga's noncompliance in various portions of her RFC analysis. (Tr. 193–194, 196). However, the ALJ also formulated Arriaga's RFC based upon her finding that the medical evidence did not support Arriaga's subjective complaints about the intensity, severity, and limiting effects of her seizure-related symptoms. (Tr. 201). For example, as described above, the ALJ discussed medical

records indicating Arriaga's CT, EEG, and MRI scans portrayed no abnormalities, (tr.

193, 195–196); Arriaga "followed a pattern of asking for [opioid pain medication], and

then only after receiving this medication did she begin shaking and seizing, . . . in order

to be given intravenous benzodiazepines soon after," (tr. 195); and Arriaga tested

positive for amphetamines and non-prescribed benzodiazepines. (Tr. 193, 195). In

addition, the ALJ considered Dr. Wellman's evaluation of Arriaga to gauge her RFC.

(Tr. 201).

The ALJ's assessment of this evidence demonstrates that the RFC formulation

did not derive solely from Arriaga's medical noncompliance, but also from ample

evidence undermining the alleged severity of Arriaga's symptoms and the scope of her

limitations. Moreover, the ALJ ultimately found Arriaga not disabled because a

significant number of jobs existed in the national economy that comported with her

RFC. (Tr. 203–204) Given the various afore-cited bases for the ALJ's findings, her

consideration of Arriaga's noncompliance does not manifest as improper.[15]

---

[15] The court notes Brewer contends the ALJ improperly considered Arriaga's noncompliance in assessing whether her seizures qualified as an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 11 at 23). However, Brewer cites the ALJ's 2015 decision for his contention. (*Id.*) Brewer, therefore, waived any challenge to the ALJ's assessment of the relevant Listings in her 2018 decision. *See Clapper*, 2018 U.S. Dist. LEXIS 162879, at *25.

In any event, the court discerns no evidence that Arriaga's seizures satisfied a relevant Listing.

Listing 11.02 establishes the following criteria for epilepsy:

> A. Generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment.

OR

B. Dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

OR

C. Generalized tonic-clonic seizures, occurring at least once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment; . . .

OR

D. Dyscognitive seizures, occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment; . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.02 (internal citations omitted).

The evidence does not support a finding that Arriaga's seizures satisfied Listing 11.02. First, the record reflects Arriaga received numerous seizure-related diagnoses, the variation in which does not clearly establish that physicians diagnosed her seizures as generalized tonic-clonic, as described in Listing 11.02(A) and Listing 11.02(C), or as dyscognitive, as described in Listing 11.02(B) and Listing 11.02(D). *See Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (claimant must have a diagnosed condition that appears in the relevant Listing). Physicians diagnosed Arriaga with: "epilepsy not otherwise specified", (tr. 728; 1313; 1020; 1244); "refractory seizure disorder", (tr. 1236); "pseudoseizures", (tr. 1427; 1442); "seizures -vs/ pseudo seizures", (tr. 757); "status epilepticus", (tr. 801); "recurrent seizures", (tr. 1365); and "generalized seizure." (Tr. 1476). A physician diagnosed Arriaga with "[t]onic-clonic seizure, refractory" during one hospitalization. (Tr. 1500).

Second, the objective evidence fails to depict the monthly consecutive occurrence of seizures as required in Listing 11.02. A claimant must establish that her impairment satisfies the criteria of a Listing through objective medical reports. *Wilkinson ex rel. Wilkinson*, 847 F.2d at 662. In this case, however, the record demonstrates that Arriaga self-reported the majority of her seizure activity. The evidence portrays that medical personnel witnessed Arriaga undergo seizures on August 9, 2013, (tr. 718), October 9, 2013, (tr. 764), January 10, 2014, (tr. 799), March 23, 2014, (tr. 1229), April 17, 2014, (tr. 1130; 1124), August 13, 2014, (tr. 964), February 13, 2015, (tr. 1440), May 12, 2015, (Tr. 1503). The evidence thus fails to portray that Arriaga's seizures occurred with the requisite frequency pursuant to Listing 11.02.

Finally, given her stress-related triggers and the lack of any abnormal neurological findings, the court recognizes Arriaga may have manifested symptoms consistent with pseudoseizures. Nevertheless, the ALJ considered Listing 12.07 for "[s]omatic symptom and related disorders" and concluded Arriaga could not satisfy the criteria of paragraph B. (Tr. 198–200).

For these reasons, any challenge to the ALJ's assessment of the Listings -- whether in her 2015 or 2018 decision -- remains meritless.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**DONE** this 31st day of January, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE